USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/25/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEDRO JUAN VELEZ,

        Plaintiff,

-against-

NANCY A. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

17-CV-06551 (BCM)

**MEMORANDUM AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Pedro Juan Velez brings this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying his application for Disability Insurance Benefits (DIB). Both parties have moved for judgment on the pleadings. Because the Administrative Law Judge (ALJ) failed to provide good reasons for crediting the opinion of a non-examining medical expert over the opinion of plaintiff's treating psychiatrist as to his mental impairments, and gave no reasons at all for rejecting the opinion of plaintiff's primary care physician as to his physical impairments, plaintiff's motion will be granted and the Commissioner's motion will be denied.

## I.    BACKGROUND

### A.    Procedural Background

Plaintiff applied for DIB on March 10, 2014, alleging disability since June 28, 2010, due to depression, "anger issues," and diabetes. *See* Certified Administrative Record (Dkt. No. 13) (hereinafter "R. __.") at 267, 283. The Social Security Administration (SSA) denied his application on April 28, 2014. (R. 124.)

Plaintiff requested a hearing before an ALJ on June 11, 2014. (R. 130.) On January 27, 2016 and June 3, 2016, plaintiff appeared in person, with an attorney, before ALJ John J. Barry. (R. 39-77, 78-99).[1] At the second hearing, vocational expert Dale Pasculli and two medical experts, Dr. Minh Vu and Dr. Chukwuemeka Efobi, appeared and testified. On September 19, 2016, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Act. (R. 17-38.) Plaintiff timely requested review by the Appeals Council (R. 262-63), but it rejected his request on June 30, 2017, making the ALJ's decision final. (R. 1-6.)

## B. Personal Background

Plaintiff was born on May 30, 1961, and was 52 years old on the date of his application. (R. 100.) He earned his GED in 1976 and then received auto mechanic training. (R. 86-87, 284.) From 1997 through 2011, plaintiff was employed as a maintenance worker. (R. 284, 309.)

Both plaintiff and his wife, Betty Velez, completed function reports in connection with plaintiff's applications. Both reports stated that as a result of plaintiff's impairments, he lacked the energy to groom or feed himself, or do housework, and that he needed reminders to take his medication. (R. 319-26, 332-37.) They additionally noted that plaintiff's impairments diminished his ability to tolerate rules and get along with those in authority, and that he had difficulty handling stress. (R. 325, 336-37.) In a disability report dated June 14, 2014 (R. 342-47), plaintiff stated that he had become even more depressed as of May 1, 2014, and had suicidal thoughts. (R. 342.)

---

[1] As explained below, the first hearing was adjourned so that the ALJ could obtain additional records from plaintiff's treating psychiatrist.

2

## II.    PLAINTIFF'S MEDICAL HISTORY

### A.    Treatment Records

#### 1.    Hudson Valley Hospital

On June 26, 2010, while intoxicated, plaintiff had a confrontation with his wife (who had just found out that he had a girlfriend), followed by an altercation with his girlfriend, after which he told his brother (who was with him at the time) that he would drive his car into a wall at high speed. (R. 392.) When his brother took his keys, plaintiff used a knife to stab himself in the left forearm and abdomen. (*Id.*) Plaintiff was arrested, then admitted to Hudson Valley Hospital, where his wounds were sutured. (R. 401, 403.) While being treated, he told a police officer that he did not wish to live any longer and asked the emergency room doctor "if he would have bled to death" had he not come to the hospital. (R. 403.) When the doctor responded "no," plaintiff asked "where he could cut himself to inflict such a wound." (*Id.*) The next day, plaintiff was admitted to an inpatient psychiatric program at Westchester Medical Center, which noted that he had a long history of depression. (R. 392.) Plaintiff stated that he had not intended to commit suicide but rather to "express his frustration." (*Id.*) Plaintiff was discharged on June 30, 2010. (R. 388.)

#### 2.    Dr. Kalsang Phuntsok

Treating notes in the record show that from 2009 to 2015 plaintiff was treated by primary care physician Kalsang Phuntsok, M.D., for hyperlipidemia, hypertension, diabetes, and medication management related to his depression. (R. 478-529, 539-42, 629-59, 772-84). Dr. Phuntsok's notes show that plaintiff's diabetes worsened or improved depending on his compliance with his medication, diet and exercise plans. For example, at plaintiff's annual examination on July 25, 2014, Dr. Phuntsok noted that his diabetes was poorly controlled due to "compliance issues," and was also possibly affected by his antipsychotic medications. (R. 644.) By October 12, 2015, plaintiff's diabetes had improved. (R. 779.) However, on December 7, 2015,

Dr. Phunstok again noted "poorly controlled diabetes," due to "non-compliance with care" and because of his anti-psychotic medication, which was "affecting his sugars." (R. 781, 783.) Throughout the course of treatment, plaintiff complained of fatigue, which according to Dr. Phuntsok had an "unclear etiology" but was likely caused by plaintiff's depression and poor diabetic control. (R. 484.)

### 3.  Dr. Maurice Haberman

Plaintiff saw psychiatrist Maurice Haberman, M.D. from at least December 2010 through August 2012 and June 2015 through February 2016. (R. 428-32, 791-793, 799, 809.) Dr. Haberman's hand-written treatment notes for these periods are in the record, but (other than the dates of treatment) are largely illegible.

### 4.  Dr. Silvio Burcesco

Plaintiff began treatment with psychiatrist Sylvio Burcescu, M.D., in April 2016. (R. 826.) At the initial consultation with a nurse practitioner in Dr. Burcescu's office, he reported that his prior psychiatrist no longer wanted to work with him after being subpoenaed to produce treatment notes in his disability case. (R. 826.) Plaintiff also denied suicidal ideation that day, but reported continuing ideation generally. (*Id.*) At sessions with Dr. Burcescu on April 12 and May 12, 2016, plaintiff again denied suicidal (or homicidal) ideation but reported chronic sadness and fatigue. (R. 823, 825.) Dr. Burcescu diagnosed bipolar I disorder (R. 821) and added Wellbutrin to plaintiff's existing medications (Effexor and Abilify). (R. 823.)

### B.  Opinion Evidence

#### 1.  Treating Physician Dr. Kalsang Phuntsok

On December 7, 2015, Dr. Phuntsok completed a Multiple Impairment Questionnaire. (R. 754-60.) Dr. Phuntsok assessed "poorly controlled" type 2 diabetes and depression with psychotic features. (R. 754.) He listed plaintiff's symptoms as fatigue, depression, and cramping in the lower

4

leg, precipitated by walking. (R. 755.) He opined that plaintiff could lift and carry up to 20 pounds frequently and 50 pounds occasionally and could sit for eight hours in an eight-hour day. (R. 756.) However, he noted that plaintiff could only stand or walk for one hour in an eight-hour day. (*Id.*) He rated plaintiff's fatigue as 9-10 out of 10 in severity, and stated that his symptoms were likely to intensify if "placed in a competitive work environment." (R. 758.) Dr. Phunstok opined that plaintiff's impairments would produce good days and bad days, and plaintiff would need to avoid pushing and pulling. (R. 760.)

## 2. Treating Psychiatrist Dr. Maurice Haberman

On September 28, 2015, Dr. Haberman completed a Psychiatric/Psychological Impairment Questionnaire. (R. 741-49, 800-808.)[2] Dr. Haberman generally opined that plaintiff had mild to moderate functional limitations, except with regard to his ability to maintain attention and concentration for extended periods of time, work in coordination with/or in proximity with others without being distracted by them, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and travel to unfamiliar places or use public transportation. (R. 744-47, 803-806.) In these areas, Dr. Haberman concluded that plaintiff had marked limitations. (*Id.*) He also opined that plaintiff was not a malingerer, would have good days and bad days, and would likely be absent from work more than three times a month. (R. 748-49, 807-808.)

Asked to identify the laboratory or diagnostic tests supporting his opinion, Dr. Haberman identified the PHQ-9, MDQ, and GAD screening tools (R. 743, 802), and attached completed

---

[2] Dr. Haberman submitted two copies of the Questionnaire, which are identical except that the first copy stated (incorrectly) that the date of plaintiff's "most recent exam" was September 25, 2012. (R. 741.) The second copy gave the date of the most recent exam as September 25, 2015. (R. 800.)

5

PHQ-9, MDQ, and GAD forms,[3] in his own handwriting, also dated September 25, 2018. (R. 750-52.)

### 3. Consultative Examiner Dr. Melissa Antiaris

On March 19, 2014, plaintiff saw psychologist Melissa Antiaris, Psy.D., for a consultative evaluation. (R. 534-38.) Based on her examination and plaintiff's self-reported medical history, Dr. Antiaris opined that plaintiff had moderate limitations in maintaining attention and concentration and a regular schedule, learning and performing complex tasks, making appropriate decisions, and relating adequately with others, and marked limitations in appropriately dealing with stress. (R. 537.)

### 4. Consultative Examiner Dr. Catherine Pelczr-Wissner

On April 15, 2014, plaintiff saw internist Catherine Pelczar-Wissner, M.D., for a consultative examination. (R. 623-26.) On examination, Dr. Pelczar-Wissner noted that plaintiff was obese, could perform only a partial squat, and had limited range of motion in the lumbar spine. (R. 624-25.) Based on her examination and plaintiff's self-reported medical history, Dr. Pelczar-Wissner opined that plaintiff had moderate restrictions in walking, bending, heavy lifting, and carrying. (R. 626.)

### C. Additional Medical Evidence

In this Court, plaintiff has submitted additional medical evidence regarding complications related to a subdural hematoma that was discovered on December 3, 2017 – six months after the

---

[3] The PHQ-9 is a screening tool used to assess the severity of depression. (R. 751.) The Mood Disorder Questionnaire (MDQ) is used to screen for bipolar disorder. *See* R. Hirschfeld, "The Mood Disorder Questionnaire: A Simple, Patient-Rated Screening Instrument for Bipolar Disorder," *Primary Care Companion J. Clinical Psychiatry* (2002), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC314375/ (last visited September 24, 2018). The Generalized Anxiety Disorder (GAD) test is a screening tool used to assess the severity of anxiety. (R. 750.)

Appeals Council rendered its decision. Pl. Mem. (Dkt. No. 16), Ex. 1. The newly-submitted records show that on December 3, 2017, plaintiff was admitted to an intensive care unit and underwent a right frontal craniotomy to remove the hematoma. *Id.* at ECF page 2. Plaintiff was discharged on December 7, 2017. However, on December 8, 2017, plaintiff was re-admitted to the hospital after experiencing a seizure. *Id.* at ECF pages 52, 58. The treating notes indicate that the likely cause of the seizure was the hospital's failure to start plaintiff on prophylactic anti-epileptic medication following his craniotomy. Ex. 1 at ECF page 77. Plaintiff was prescribed anti-seizure medication and released on December 9, 2017. *Id.* at 58-59.

## III.    HEARING

### A.    January 27, 2016 Hearing

On January 27, 2016, plaintiff and his counsel appeared at a hearing before ALJ Barry and testified regarding his impairments. (R. 80.) A vocational expert and two medical examiners also appeared and prepared to testify. However, an issue arose concerning Dr. Haberman's treating notes. Plaintiff testified that he had seen Dr. Haberman every three months "for at least ten years." (R. 94.) But one of the medical examiners pointed out that the notes in the file were "illegible" (*id.*), and the ALJ added that there were no treating notes from Dr. Haberman prior to 2010 or from 2013 to 2015. (R. 95.) After the medical expert confirmed that it would be "very important" to get the missing notes – because "his medical source statement shows a probable disability" and "I need some treatment records to back this up" (R. 95-96) – the ALJ adjourned the hearing to "subpoena those records" (R. 97) to get "something that we can actually read, rather than just copies of the same thing." (*Id.*)

By subpoena dated February 8, 2016, signed by ALJ Barry, the SSA asked Dr. Haberman for "ALL MEDICAL RECORDS" concerning plaintiff Velez. (R. 794-95.) On February 29, 2016,

7

the SAA received, from Dr. Haberman's office, additional copies of some of the same treating notes already in the ALJ's file, together with new (and equally illegible) notes for sessions on December 21, 2015 and February 15, 2016. (R. 798, 809, 799.)

## B.   June 3, 2016 Hearing

### 1.   Plaintiff's Testimony

The hearing re-convened on June 3, 2016. (R. 41.) Plaintiff again appeared with his attorney. Internist Minh Vu, M.D. and psychiatrist Chukwuemeka Efobi, M.D. appeared as medical experts and testified about plaintiff's physical and mental impairments, respectively. (R. 41, 810, 813.) Vocational expert Dale Pasculli also appeared and testified. (R. 41, 376.) Plaintiff stated that his symptoms were sporadic pain in his legs, feet and hands, aggravated by standing and walking. (R. 46.) He did not take any pain medication because he did not "like narcotics" and "that's what they offer for that." (R. 47.) He testified that he did not do house work, but was able to feed, dress, and bathe himself, and drive to visit relatives every other day. (R. 47-48, 53.) He testified that he was inexplicably tired from "just being around." (R. 53.) He said he was able to stand for ten minutes, sit for 30 minutes, lift up to seven pounds, and climb stairs. (R. 53-54.) He testified that mowing his lawn every two weeks took him "six hours" because he had to take breaks every 10 minutes. (R. 47, 55.)

### 2.   Medical Expert Dr. Minh Vu

Dr. Vu, testifying as a non-examining medical expert (R. 57), identified plaintiff's impairments as heart condition, arthritis, obesity, hypertension and hepatitis-C. (R. 59.) Dr. Vu opined that plaintiff could lift 50 pounds occasionally and 35 pounds frequently; could stand or walk for six hours a day; had no limitations in sitting, using his hands or lower extremities; but should not climb ropes, ladders, or scaffolds (due to a history of hypertension) and should avoid work at unprotected heights or near moving equipment. (R. 60-61.)

8

### 3. Psychiatric Medical Expert Dr. Chukwuemeka Efobi

Dr. Efobi, also testifying as a non-examining medical expert (R. 61), stated that plaintiff had mild restrictions regarding his activities of daily living and mild to moderate restrictions with regard to social functioning, meaning that he would "probably do best with superficial interaction with others and simple tasks, nothing he needs to multi-task." (R. 65.) Dr. Efobi disagreed with Dr. Haberman's assessment that plaintiff had "marked" limitations in his ability to accept instructions and respond appropriately to criticism from supervisors or get along with coworkers. (R. 68, 70.) However, when pressed by counsel, Dr. Efobi agreed that "Dr. Haberman would be in a better position to assess [plaintiff's] condition than someone who [simply] reviewed his records," and stated that he needed Dr. Haberman's treatment notes to accurately assess his opinion. (R. 69-70.)

### 4. Vocational Expert Dale Pasculli

The ALJ then took the testimony of vocational expert Dale Pasculli. (R. 72.) The ALJ asked Pasculli to assume a hypothetical claimant who was able to lift and carry 25 pounds frequently and 50 pounds occasionally; was able to sit, stand, and walk six hours in an eight-hour work day; could never climb ladders, ropes, and scaffolds; would need to avoid unprotected heights and exposure to dangerous machinery; could occasionally climb ramps and stairs;, and could frequently bend, stoop, kneel, crouch and crawl. (R. 73.) With respect to mental limitations, the hypothetical claimant could follow and understand simple directions and instructions; and could perform simple, routine, repetitive tasks in a low-stress work environment with occasional contact with supervisors, coworkers and the general public. (R. 74.) The vocational expert testified that such a claimant would be able to perform the job of cook helper and packager at the medium exertional level, or photocopy machine operator, routing clerk, or housekeeping cleaner at the light exertional level. (R. 74-75.) On examination by plaintiff's lawyer, the vocational expert testified that if the

hypothetical claimant were limited to being able to stand or walk for only one hour, he would be unable to perform any of these jobs. (R. 75-76.) The ALJ then adjourned the hearing.

## IV.    ALJ DECISION

### A.    Standards

A five-step sequential evaluation process is used pursuant to 20 C.F.R. § 404.1520(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity [RFC] to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's RFC, age, education, and past relevant work experience. *See* 20 C.F.R. §§ 404.1512(f) (2015), 404.1560(c).

The regulations as they existed at the time of the Commissioner's decision provided further guidance for evaluating whether a mental impairment meets or equals a listed impairment at the

third step. In a "complex and highly individualized process," 20 C.F.R. § 404.1520a(c)(1) (2011), the ALJ was required to determine how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2) (2011). The main areas to be assessed were the claimant's (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3) (2011).[4] The first three categories were rated on a five-point scale, from "none" through "mild," "moderate," "marked," and "extreme." 20 C.F.R. § 404.1520a(c)(4) (2011). A "marked" limitation could "arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively and on a sustained basis." 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.00(C) (2016). The last area – episodes of decompensation – was rated on a four-point scale: none, one or two, three, and four or more. 20 C.F.R. § 404.1520a(c)(4) (2011).

With respect to certain listed mental disorders, the claimant was also required to show that he had at least two of the so-called "paragraph B criteria" or (for affective and anxiety disorders) "paragraph C criteria."[5] The paragraph B criteria for such disorders required at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining

---

[4] As of March 27, 2017, the text of 20 C.F.R. §§ 404.1520a(c)(3) and (c)(4) has been amended to read, "We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." In this Memorandum and Order I apply the regulations as they existed at the time of the Commissioner's decision. Citations to regulations that have since been amended include the date of the version that was in effect at the time of the ALJ's decision.

[5] The requirements for substance addition disorders were met where there were "changes or physical changes associated with the regular use of substances that affect the central nervous system," and where the requirements for, *inter alia*, depressive disorders, anxiety disorders, or personality disorders are satisfied. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.09 (2016).

social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation. *See* 20 C.F.R. Pt. 404, subpt. P, app'x 1 §§ 12.04(B) (affective disorders), 12.06(B) (anxiety related disorders), 12.08(B) (personality disorders) (2016).

The paragraph C criteria for affective disorders required: (1) repeated episodes of decompensation, each for extended duration; (2) a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.04(C) (2016). The paragraph C criteria for anxiety disorders required a complete inability to function independently outside the area of one's home as a result of the disorder. 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.06(C) (2016).

If a mental disorder does not meet or equal a listed impairment, it may still qualify as a disability if the claimant's RFC does not allow him to perform the requirements of his past relevant work, or if the claimant's limitations, age, education, and work experience dictate that he cannot be expected to do any other work in the national economy. 20 C.F.R. § 404.1520(e). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(3).

Finally, at step five, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy" that the claimant can do, given his RFC. 20 C.F.R. § 404.1560(c)(2). "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-

exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at \*18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

## B. Application of Standards

At step one, the ALJ found that plaintiff had engaged in substantial gainful activity, after the alleged onset of his injury, until December 31, 2011. (R. 22.) Therefore, the ALJ limited his decision to the period between January 1, 2012 and the date of the decision. (R. 22-23.)

At step two, the ALJ determined that plaintiff suffered from the following "severe" impairments: hypertension, depressive disorder, arthritis, and obesity. (R. 23.) The ALJ found that plaintiff's diabetes mellitus was not severe because it was well-controlled with medication and there was no evidence of significant functional limitations. (R. 24)[6] The ALJ also found that plaintiff's bipolar disorder, anxiety disorder, and personality disorder were not medically determinable impairments because there was no "significant medical evidence" to support these diagnoses. (*Id.*)

At step three, the ALJ concluded that none of plaintiff's physical or mental impairments met or medically equaled the severity of any of the listed impairments. (R. 24.)

At step four, the ALJ concluded that plaintiff was not able to perform his past work (R. 30), but determined that he had the RFC to:

> lift/carry 25 pounds frequently and 50 pounds occasionally; sit/stand/walk for six hours each in an 8 hour workday; never climb ropes, ladders or scaffolds; avoid unprotected heights and dangerous machinery; occasionally climb ramps and stairs; frequently bend, stoop, crouch, crawl and kneel[.]

---

[6] The ALJ additionally found that plaintiff's hepatitis-C was not severe because it was under good control with medication; plaintiff's cardiac arrhythmia was not severe because cardiac tests, chest x-rays, and stress tests showed normal findings; and plaintiff's history of poly-substance abuse was not severe because there was evidence that it was in full remission. (R. 24.) These findings are not challenged in this Court.

(R. 26.) In addition, the ALJ found that plaintiff was:

> able to follow and understand simple directions and instructions; and, able to perform simple routine, repetitive tasks in a low stress work environment with occasional contact with supervisors, coworkers and the general public.

(R. 26-27.)

In determining plaintiff's mental RFC, the ALJ gave "very significant weight" to Dr. Efobi's opinion that plaintiff had "only mild limitations in activities of daily living because of psychological impairments, mild to moderate limitations in social functioning and concentration and pace and one episode of decompensation." (R. 28.) The ALJ credited Dr. Efobi's opinion because he is "an expert in the field of psychiatry," has "extensive program knowledge," and "reviewed the entire record." (R. 28-29.)

The ALJ gave "some weight" to the opinion of consultative examiner Dr. Antiaris that plaintiff would have "moderate limitations maintaining attention and concentration, maintaining a regular schedule, learning and performing complex tasks, making appropriate decisions, and relating adequately with others," and "marked limitations dealing appropriately with stress," because the "medical evidence does not fully support the degree of limitations Dr. Antiaris found," and because she did not review all the evidence. (R. 29.)

The ALJ gave "little weight" to Dr. Burcescu's opinion that plaintiff had bipolar disorder because, although he was a treating physician, he only saw plaintiff on two occasions, and, according to the ALJ, his diagnosis was "completely unsupported" by plaintiff's normal mental status examinations on both of those visits. (R. 29.)

The ALJ gave "some weight" to the second copy of treating psychiatrist Dr. Haberman's September 28, 2015 opinion,[7] "based on the treatment notes and as reflected in the non-exertional

---

[7] The ALJ gave "no weight" to the first copy of Dr. Haberman's September 28, 2015 opinion, which indicated a last treatment date of September 25, 2012 (R. 29), stating that it was

14

portion of the residual functional capacity determined herein," but not to the extent that Dr. Haberman found a "marked degree of limitation." (R. 29.) The ALJ described Dr. Haberman's treating notes as covering "a relatively short period over 6-8 months in 2015-16." (*Id.*)[8] The ALJ did not give any weight to the diagnostic tests that Dr. Haberman cited in and attached to his opinion (R. 750-52), because they did not list "the name of the patient, the name of the person completing the form, or the date." (R. 29.)

With respect to plaintiff's physical RFC, the ALJ accorded "some weight" to treating physician Dr. Phuntsok's opinion "insofar as most limitations conform to those used in the residual functional capacity found herein." (R. 30.) The ALJ gave "very significant weight" to medical expert Dr. Vu's opinion that plaintiff had the RFC for "medium work" with certain limitations. The ALJ noted that Dr. Vu, like Dr. Efobi, was "an expert in his field," had "extensive program experience," and "reviewed the entire medical record." (R. 29.)

The ALJ gave "some weight" to consultative examiner Dr. Pelczar-Wissner's opinion that plaintiff had "moderate restrictions in walking, bending, heavy lifting and carrying," noting that she provided only a one-time examination and did not perform any pulmonary tests. (R. 29.) The ALJ reasoned that the degree of limitations she found were "not well supported by the medical

---

"unsupported by any treatment notes" and referred to "a period of treatment" ending September 25, 2012. (*Id.*) The ALJ appeared to be under the impression that Exhibit 22F (R. 800) and Exhibit 13F (R. 741) were two separate opinions. In fact, as noted above, they were two separate copies of the same opinion. The second copy, produced pursuant to subpoena, differed from the first only in that the "date of most recent exam" was corrected to accurately reflect that as of the date of the opinion, Dr. Haberman had last seen the plaintiff on September 25, 2015 (three days prior), not September 25, 2012 (three years prior). (*See* R. 792-93, 809 (September 25, 2015 treating notes)).

[8] The ALJ appeared to be under the impression that these were the only treating notes from Dr. Haberman in the record. In fact, as noted above, Dr. Haberman also provided notes dated from December 2010 through August 2012. (R. 428-32.)

15

record as a whole," specifically, her physical examination, which showed only "benign findings except for some limitation of motion of the lumbar spine." (R. 29-30.)

At step four, the ALJ found that plaintiff could not perform his past relevant work. (R. 30.)

At step five, on the basis of the vocational expert's testimony, the ALJ concluded that plaintiff had the RFC to perform a significant number of jobs in the national economy, including work as a cook helper, hand packager, photocopy machine operator, routing clerk, and cleaner-housekeeping. (R. 31.)

## V. ANALYSIS

### A. Standard of Review

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Commissioner of Social Security*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The reviewing court may set aside a decision of the Commissioner only if it is "based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, where an applicant challenges the agency's decision, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must

16

determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at \*8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi*, 2009 WL 50140, at \*21 (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999), and *Williams v. Bowen*, 859 F.2d 255, 256 (2d Cir. 1988)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). Thus, the substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Id.*; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Thus, remand may be appropriate if the ALJ fails to provide an adequate "roadmap" for his reasoning. But if the ALJ adequately explains his reasoning, and if his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision

17

on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). *See also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner"); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) ("[T]his Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review.") (quoting *Beres v. Chater*, 1996 WL 1088924, at *5 (E.D.N.Y. May 22, 1996)).

Here, plaintiff seeks remand on four principal grounds, the most substantial of which is his contention that the ALJ erred by failing to grant controlling weight to the opinions of his treating physicians, Dr. Phuntsok and Dr. Haberman. Pl. Mem. at 13-14. Plaintiff also argues that the ALJ's RFC determination was not supported by substantial evidence, *id.* at 14-15; that the ALJ erred in finding that plaintiff's diabetes, chronic fatigue, bipolar disorder and anxiety disorder were not severe or medically determinable impairments, *id.* at 15-17; and that the case should be remanded for consideration of the new evidence, related to his 2017 brain hematoma, that he submitted with his motion. *Id.* at 17-18. The Court agrees that the ALJ misapplied the treating physician rule, and that remand is warranted on that basis. Because the Court finds that the ALJ committed a legal error in his treatment of the opinions of plaintiff's treating physicians, the Court does not reach plaintiff's other arguments.

## B. The Treating Physician Rule

An ALJ is required to give controlling weight to the opinion of a claimant's treating physician so long as that opinion is well-supported by medical findings and is not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(c)(2) (2012). The treating physician rule recognizes that a claimant's treating physician is "most able to provide a detailed, longitudinal

picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id. See also Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.").

Where mental health treatment is at issue, the treating physician rule takes on added importance. *Rodriguez v. Astrue*, 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009). "A mental health patient may have good days and bad days; [he] may respond to different stressors that are not always active. Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination." *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015). *See also Richardson v. Astrue*, 2009 WL 4793994, at *7 (S.D.N.Y. Dec. 14, 2009) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health.") (internal citations and quotation marks omitted).

If the ALJ does not afford controlling weight to the opinion of a treating physician, he must give "good reasons" for doing so, and "comprehensively set forth [the] reasons for the weight assigned" to the opinion. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir. 2008)); 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."). In particular, the ALJ must "explicitly consider . . . (1) the frequency, length,

nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129); *see also* 20 C.F.R. § 404.1527(c)(2)-(c)(6) (listing same factors). A "failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek*, 802 F.3d at 375; *Halloran*, 362 F.3d at 33.

The "good reasons" requirement serves the dual purpose of permitting the Court and the claimant to understand the ALJ's decision-making process. An ALJ who fails to provide an adequate roadmap for his reasoning deprives the Court of the ability to determine accurately whether his opinion is supported by substantial evidence. *Ferraris*, 728 F.2d at 587 (noting that "the crucial factors in any determination must be set forth with sufficient specificity"); *Halloran*, 362 F.3d at 33 (the "good reasons" requirement assists court's review of ALJ's decisions); *Rivera v. Astrue*, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) ("[I]n order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered.") (citation omitted); 20 C.F.R. § 404.1527(c)(2) (an ALJ is required to apply the regulatory factors and give good reasons for the weight assigned). With respect to the disability claimant, the "requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even – and perhaps especially – when those dispositions are unfavorable." *Snell*, 177 F.3d at 134. While a plaintiff is not entitled to have the opinion of his treating physician given controlling weight, where an ALJ does not credit his treating physician's findings, he is entitled to an explanation. *Id.*

In this case, there is no dispute that Dr. Haberman and Dr. Phuntsok were plaintiff's treating physicians. Therefore, the ALJ was required to consider the regulatory factors before assigning

less than controlling weight to their opinions, and provide "good reasons" for the weight he ultimately did assign. 20 C.F.R. § 404.1527(c)(2). Here, with respect to both physicians, the ALJ failed to consider any of the regulatory factors and further erred by failing to give good reasons for the weight he assigned their opinions. As to Dr. Haberman, the ALJ also appeared to misunderstand or misconstrue the relevant portions of the record. As to Dr. Phuntsok, the ALJ articulated no reasons whatsoever for giving his opinion only "some" weight.

### 1. Dr. Haberman

The ALJ gave "some weight" to the second copy of Dr. Haberman's September 28, 2015 opinion, "based on the treatment notes and as reflected in the non-exertional portion of the residual functional capacity determined herein but not a marked degree of limitation." (R. 29.) Although the ALJ's intention is not entirely clear, the Court presumes that the phrase "but not a marked degree of limitation" means that the ALJ rejected the portions of Dr. Haberman's opinion that found plaintiff had marked limitations with regard to his ability to maintain attention and concentration, work in coordination with/or in proximity with others, accept instructions and respond appropriately to criticism, get along with co-workers or peers, and travel to unfamiliar places or use public transportation. (R. 744-47, 803-806.) As so construed, the ALJ's language describes *what* the ALJ did, but does not explain *why* he did it.

Similarly, the ALJ's statement that the weight he gave to Dr. Haberman's opinion was "based on the treatment notes" is unhelpful. The Court cannot determine whether the opinion were partially *credited* because of the treating notes or partially *discredited* because of them. Nor does the ALJ explain (here or elsewhere) what he saw in Dr. Haberman's treating notes that caused him to assign the weight he did. In all likelihood, this is because – as the ALJ noted at plaintiff's first hearing – the notes are largely illegible. Recognizing the problem, the ALJ adjourned that hearing,

21

stating, "We'll subpoena those records. We'll ask him to give us something that we can actually read, rather than just copies of the same thing." (R. 97.)

ALJ Barry did send a subpoena to Dr. Haberman, but the subpoena merely instructed the psychiatrist to produce "ALL MEDICAL RECORDS" concerning plaintiff Velez. (R. 794-95.) It did not ask for typed or transcribed records. Not surprisingly, the records produced in response to the subpoena were, for the most part, duplicate copies of the same handwritten documents previously submitted (R. 797, 809), together with a few more recent treatment notes, equally difficult to read. (R. 799.)

"Where the medical records are crucial to the plaintiff's claim, illegibility of important evidentiary material has been held to warrant a remand for clarification and supplementation." *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975); *accord Johnson v. Comm'r of Soc. Sec.*, 2017 WL 4155408, at \*10, n.2 (S.D.N.Y. Sept. 18, 2017) (remanding for violation of the treating physician rule where it "appears likely that the ALJ's cursory treatment of Dr. Gurniak is related to the fact that Dr. Gurniak's handwritten treatment records are largely indecipherable," but the ALJ failed to "seek clarification or even transcription of the treating doctor's notes"). This rule has particular force where, as here, the ALJ has discounted a treating physician's opinion by reference to the illegible notes. As the court explained in *Silva v. Colvin*, 2015 WL 5306005 (W.D.N.Y. Sept. 10, 2015), the indecipherability of the underlying treating notes leaves the reviewing court "unable to determine whether the ALJ's main reason for discounting his opinions . . . is supported by substantial evidence." *Id.* at \*5 (remanding "for transcription of Dr. Ortega's notes, questionnaires, and reports"). *See also Connor v. Barnhart*, 2003 WL 21976404, at \*8 (S.D.N.Y. Aug.18, 2003) (where "many of the medical records are illegible, as the handwritten notes of the physicians are difficult to decipher," the ALJ "did not, 'and indeed could not, decide

22

[plaintiff's] claim with the benefit of a complete and accurate record.'") (quoting *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996)).

In this case, the failure to seek legible treatment notes was not harmless. Not only did the ALJ cite the notes (without citing anything *in* the notes) in support of his decision to grant only "some" weight to Dr. Haberman's opinion at step four; he also relied on the lack of supporting treatment records to find, at step two, that although Dr. Haberman diagnosed plaintiff with bipolar disorder and anxiety disorder, these were not "medically determinable impairments." (R. 24.) According to the ALJ, "there is no significant medical evidence including treatment and results of mental status examination to support these diagnoses. Thus, these conditions are not medically determinable impairments." (*Id.*) The ALJ could not have exercised his obligation to consider all of the relevant evidence before him, nor can this Court undertake the required "plenary review" of the administrative record, *Pratts*, 94 F.3d at 37, if the most "significant medical evidence" was indecipherable.

Moreover, the ALJ appears to have misread, or misunderstood, the nature of the records submitted by Dr. Haberman. He described Dr. Haberman's treating notes as covering "a relatively short period over 6-8 months in 2015-16" (R. 29), when in fact the record also contained notes from 2010-2012. (R. 428-32.) He rejected the first copy of Dr. Haberman's opinion as "unsupported by any treating notes" (R. 29), when in fact it was the same opinion, supported by the same notes, as the second copy, to which the ALJ gave "some weight." And he accorded "no weight" to the results of the GAD, PHQ-9, and MDQ diagnostic tests that Dr. Haberman attached to his opinion (750-52), and cited in support his conclusions (R. 743), because the test forms

23

themselves "did not indicate the name of the patient, the name of the person filling out the form, or the date." (R. 29.)[9]

These factual errors would require remand even if the ALJ had provided specific reasons for discounting Dr. Haberman's opinion. *See Pratts*, 94 F.3d at 38 (If the ALJ commits "factual errors in evaluating the medical evidence," his decision denying benefits "is not supported by substantial evidence."); *Wilson v. Colvin*, 213 F. Supp. 3d 478, 491 (W.D.N.Y. 2016) (internal quotations omitted) ("although the ALJ provided 'specific' reasons for discounting Plaintiff's credibility, the Court cannot find that they were 'legitimate' reasons because they are based on a misconstruction of the record"); *Edel v. Astrue*, 2009 WL 890667, at \*15 (N.D.N.Y. Mar. 30, 2009) (ALJ's finding was "not supported by substantial evidence where [the ALJ] relied primarily upon a misstatement of the record").

### 2.    Dr. Phuntsok

The ALJ accorded "some weight" to Dr. Phuntsok's opinion, "insofar as most limitations conform to those used in the residual functional capacity found herein." (R. 30.) The physical RFC formulated by the ALJ was consistent with Dr. Phuntsok's opinion that plaintiff could lift and carry up to 20 pounds frequently and 50 pounds occasionally. (R. 756.) However, the ALJ found that plaintiff could "sit/stand/walk for six hours each in an 8 hour workday" (R. 26), thereby rejecting Dr. Phuntsok's opinion that plaintiff could stand or walk for only one hour in an eight-hour day. (R. 756.) This issue was outcome-determinative.[10] Similarly, the RFC made no

---

[9] In fact, the diagnostic forms are all dated September 25, 2015, which is when Dr. Haberman last saw the plaintiff before completing his opinion on September 28, 2015.

[10] The vocational expert testified that if the hypothetical claimant were limited to one hour of standing or walking, he could not do any of the jobs listed by the expert. (R. 75-76.) Had the ALJ fully credited Dr. Phuntsok's opinion, therefore, he could not have concluded, on the record adduced at the hearing, that there was "other work which the claimant could perform." *Jasinski*, 341 F.3d at 183-84.

24

allowances for plaintiff's fatigue (which Dr. Phuntsok rated as 9-10 out of 10 in severity) and did not include any limitations on pushing and pulling, which according to Dr. Phuntsok, plaintiff "would need to avoid." (R. 758, 760.)

The ALJ gives no explanation for the weight he accorded to Dr. Phuntsok's opinion. Not only does he fail to "explicitly consider" the regulatory factors, *Selian*, 708 F.3d at 418; he fails to identify any reasons whatsoever for his decision to discount the opinion of plaintiff's treating physician.

It is possible that he had good reasons. There are portions of the record that are inconsistent with Dr. Phuntsok's views. For example, in plaintiff's function report he stated that he was "physically not affected" by his impairments. (R. 334-35.) There was also opinion evidence from other physicians (to which the ALJ assigned varying degrees of weight and provided reasons for doing so), that contradicted the limitations proposed by Dr. Phuntsok. However, the ALJ did not cite any of this evidence as a basis for discounting Dr. Phuntsok's opinion, and did not make any effort to resolve any genuine conflicts in that evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

Because the ALJ failed to consider *any* of the regulatory factors, and failed to give *any* reasons for the less-than-controlling weight he assigned to the opinion of Dr. Phuntsok, remand is appropriate. *See Winn v. Colvin*, 541 F. App'x 67, 70 (2d Cir. 2013) (remanding where the "ALJ includes no explanation for why [treating physician's] assessment was given only little weight"); *Newbury v. Astrue*, 321 F. App'x 16, 17-18 (2d Cir. 2009) (vacating and remanding for further consideration where the ALJ and the Appeals Council failed to "state any specific any reasons" for not crediting opinions of plaintiff's treating psychiatrist); *Sanchez v. Colvin*, 2015 WL 5774853, at *8 (E.D.N.Y. Sep. 30, 2015) (remanding where, among other things, the ALJ failed to give good

reasons for declining to give controlling weight to plaintiff's treating physicians' opinions); *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 187-88 (E.D.N.Y. 2011) (remanding where the ALJ failed to give good reasons for failing to consider the diagnoses of plaintiff's treating physicians regarding her mental impairments).

On remand, the ALJ must (a) request or direct the preparation of a transcription or other legible version of Dr. Haberman's treating notes; and (b) re-evaluate the opinions of Dr. Haberman and Dr. Phuntsok in light of this opinion.[11] If, on remand, ALJ Barry declines to assign controlling weight to one or both of this opinions, he must explicitly consider the regulatory factors and "comprehensively set forth [the] reasons for the weight assigned." *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129). Finally, the ALJ must (c) re-assess plaintiff's impairments and residual functional capacity in light of his conclusions.

## VI.    CONCLUSION

For the foregoing reasons, plaintiff's motion is GRANTED, the Commissioner's motion is DENIED, and this action is REMANDED for further proceedings consistent with this Order.

Dated: New York, New York
       September 25, 2018

**SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**

---

[11] If the ALJ is genuinely uncertain as to whether the PHQ-9, MDQ, and GAD forms cited in Dr. Haberman's opinion relate to plaintiff Velez, he should also seek clarification on this point from Dr. Haberman.